IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATE OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 06-00149-01-CR-W-DW |
| ) | |
| ANDRE L. JONES, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is Defendant's Motion to Suppress Evidence on grounds that the evidence was seized in violation of the Fourth and Fourteenth Amendments. Defendant moves the court to suppress physical evidence obtained during a search of the vehicle he was driving on September 4, 2005, arguing that the search was conducted incident to an "illegal arrest."

*I. BACKGROUND*

On September 4, 2005, Kansas City, Missouri Police Officers Brian Brewer and Chante Carpenter were dispatched to 4009 Virginia, Kansas City, Missouri, to investigate a party armed with a gun. The officers first spoke to a man who lived at 4009 Virginia, Ernest Ford. Mr. Ford stated he had broken up a fight in front of his house that had occurred between two black men and that the men fled on foot in opposite directions; he did not know whether either man was armed. Officers Brewer and Carpenter then talked to the reporting party, Rochelle Owens, who stated she saw a black male wearing a white shirt and blue shorts fire a gun at a second black man. Ms. Owens said the shooter left the scene driving a blue Camaro.

1

Officers Brewer and Carpenter returned to 4009 Virginia to talk to Mr. Ford a second time. While there, they observed a blue Camaro drive into the neighborhood that matched the description of the car given by Ms. Owens. The Camaro ultimately pulled into the driveway at 4009 Virginia and Defendant got out of the car. Officer Carpenter asked Defendant to stop and stated she would like to speak with him. Defendant did not stop, however, and continued to walk past her toward the residence.

Defendant encountered Officer Brewer when he reached the porch and attempted to walk past him as well. Officer Brewer physically stopped Defendant from entering the house, placed him in handcuffs, and walked him to the street in front of Officer Brewer's patrol car. There, Officer Brewer questioned Defendant about the reported incident, to which Defendant responded that he was the victim of the shooting. Officer Brewer radioed a warrant check to the dispatcher and learned that Defendant had eight outstanding warrants and no operator's status. Defendant was then placed under arrest.

Subsequent to Defendant's arrest, a search was conducted of the Camaro. Officers recovered fifteen live rounds of 7.62 millimeter ammunition, five live rounds of .32 caliber ammunition, one .32 caliber spent casing, a SKS magazine, a SKS rifle, and a black revolver. The Camaro was then towed from the scene.

An indictment was returned on April 19, 2006, charging Defendant with being a felon in possession of a firearm. On June 9, 2006, Defendant filed a motion to suppress evidence (Doc. No. 19). The government responded to Defendant's motion on June 20, 2006 (Doc. Nos. 21, 22). I conducted an evidentiary hearing on August 17, 2006. The government appeared by Assistant United States Attorney Stefan C. Hughes. Defendant was present, represented by appointed counsel

Ronna Holloman-Hughes. The government called Kansas City, Missouri Police Officer Brian Brewer[1] and Kansas City, Missouri Police Officer Chante Carpenter to testify. In addition, the following exhibits were marked and admitted into evidence:

    Government's Exhibit 1:    Videotape of Incident
    Government's Exhibit 2:    Police Officer Brian Brewer's Report
    Government's Exhibit 3:    Inventory Report involving SKS
    Government's Exhibit 4:    Inventory Report involving revolver

At the close of the hearing, I gave the parties two weeks to provide a transcript of the portions from Government's Exhibit 1 they wanted the court to consider in ruling Defendant's motion to suppress (Tr. at 59-60). Upon receipt, I marked the transcript and admitted it into evidence, without objection, as Court's Exhibit 1 (Doc. No. 29).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. On September 4, 2005, Kansas City, Missouri Police Officers Brian Brewer and Chante Carpenter were dispatched to the area of 4009 Virginia, Kansas City, Missouri, to investigate a party armed with a gun (Tr. at 4, 31-32, 51). Upon arrival, the officers first interviewed Ernest Ford about the incident (Tr. at 4-5, 32). Mr. Ford stated that he lived at 4009 Virginia (Tr. at 6). Two unknown men had been fighting in front of his house (Tr. at 5, 33). He told the men that they could not fight in front of his house and made them leave (Tr. at 5, 33). Mr. Ford reported that both men left

---

[1] As of the date of the suppression hearing, Brian Brewer had taken a job with the Federal Air Marshal Service and was no longer employed by the Kansas City, Missouri Police Department (Tr. at 3). For purposes of this Report and Recommendation, however, he will be referred to as "Officer Brewer."

on foot and went opposite directions (Tr. at 5, 33). He did not know if either man had any guns (Tr. at 5, 33).

2. Police Officers Brewer and Carpenter also interviewed the reporting party, Rochelle Owens (Tr. at 6, 18, 33; Court's Exh. 1; Gvt. Exh. 1; Gvt. Exh. 2). Ms. Owens resided at 4025 Virginia, south of the location where the alleged incident took place (Tr. at 6, 33). Ms. Owens stated she observed two black males in front of 4009 Virginia; one of the men drove a blue Camaro and the other drove an unspecified white car (Tr. at 6, 34). The man who drove the blue Camaro had a gun and fired one shot at the other man (Tr. at 6, 34, 46, 51; Court's Exh. 1, p. 1). She described the shooter as a heavy black male -- weighing approximately two hundred and fifty pounds, with braids, wearing a white shirt and blue shorts (Tr. at 46; Court's Exh. 1, p. 1; Gvt. Exh. 1).

3. After interviewing Ms. Owens, Officer Brewer went back to 4009 Virginia to speak with Mr. Ford again (Tr. at 7, 35). During their conversation, Officer Brewer observed Defendant drive a blue Camaro into the neighborhood (Tr. at 7, 35). The Camaro matched Ms. Owen's description of the vehicle that left the scene after the shot was fired (Tr. at 24; Gvt. Exh. 2, p. 3). Defendant briefly stopped in the middle of the street (Tr. at 8, 35, 36; Gvt. Exh. 1).

4. When Officer Carpenter saw the Camaro stop in the street, she stepped to the edge of the driveway so she would be able to radio a plate number (Tr. at 36). Instead, however, Defendant drove the car into the driveway at 4009 Virginia (Tr. at 8, 36).

4

Neither Officer Brewer nor Officer Carpenter drew their gun or any other weapon (Tr. at 25-26, 53).

5. Officer Carpenter told Defendant to get out of the car and stated she needed to talk to him (Tr. at 8, 24, 36, 54). She repeated this verbal command several times (Tr. at 36). Defendant did get out of the car, but ignored Officer Carpenter's command and walked past her toward the residence (Tr. at 8, 24, 36-37, 54; Gvt. Exh. 2, p. 3). It appeared to Officer Carpenter that Defendant locked the doors as he got out of the vehicle (Tr. at 36, 54). Defendant was wearing blue[2] shorts and no shirt, although he had a white shirt with him (Tr. at 28; Gvt. Exh. 1).

6. Officer Brewer was standing on the steps of the porch at 4009 Virginia, blocking the entrance to the residence (Tr. at 8, 24, 37; Gvt. Exh. 2, p. 4). When he saw that Defendant did not respond to Officer Carpenter, he told Defendant to stop so that they could talk about what had happened (Tr. at 8, 37, 54; Gvt. Exh. 2, p. 4). Defendant responded, "I'm going in the house man." (Gvt. Exh. 1; Court's Exh. 1, p. 2; Tr. at 26). Defendant was uncooperative and attempted to walk past Officer Brewer, but Officer Brewer ultimately physically stopped Defendant (Tr. at 8, 25, 37).

7. Officer Brewer handcuffed Defendant and the parties on the porch started yelling and became loud (Tr. at 8, 26, 37). Defendant was taken to the front of Officer Brewer's

---

[2]Officer Brewer, in fact, testified at the suppression hearing that Defendant was wearing black shorts and carried a white shirt (Tr. at 28). However, review of the videotaped encounter as well as of Officer Brewer's report reveal Defendant's shorts were black (Gvt. Exh. 1; Gvt. Exh. 2. In fact, the report indicates that both males involved in the alleged altercation wore blue shorts (Gvt. Exh. 2); the inconsistency in Officer Brewer's testimony does not suggest he confused Defendant with Mr. Johnson during the suppression hearing.

patrol vehicle, which was parked on the street (Tr. at 8, 9, 37; Gvt. Exh. 2, p. 4). Officer Brewer moved Defendant to the street for he and his partner's personal safety, as there was a crowd larger than five people, including women and young children, on the porch and he did not know what was inside the house (Tr. at 8, 9, 33). He did know that people were still inside the house, however, as he could hear their voices from the porch (Tr. at 8-9).

8. When Officer Brewer and Defendant arrived at the patrol car, Defendant stated he was the man at whom the shot had been fired (Gvt. Exh. 1, p. 2; Gvt. Exh. 2, p. 4). He informed Officer Brewer that he was not the man who had fired the gun (Court's Exh. 1, p. 3).

9. Neither Officer Brewer nor Officer Carpenter had ever encountered Defendant prior to September 4, 2005 (Tr. at 9, 28). When Defendant pulled into the driveway of 4009 Virginia, they did not specifically know whether Defendant was armed but did know that the driver of a blue Camaro had been involved in an incident with a handgun (Tr. at 9, 38).

10. Officer Carpenter escorted Officer Brewer and Defendant halfway to Officer Brewer's patrol car then returned back to the Camaro (Tr. at 10, 38). Several people from the house were yelling and moving toward the car (Tr. at 10). The officers were uncertain what these people were doing and did not know if there was a weapon in the car (Tr. at 10). Officer Carpenter, therefore, stood by the car to prevent anyone from entering (Tr. at 10, 17, 26-27). She removed her PR24, a defense device resembling a stick with a small handle, to calm people down and keep them away

from the car (Tr. at 38). Officer Carpenter radioed for assistance and Sergeant Taylor responded to the scene; they were successful in keeping others away from the Camaro (Tr. at 38-39).

11. Officer Brewer did not observe anyone moving toward the Camaro who had a key (Tr. at 27). Defendant, in fact, had the keys behind his back and was manipulating the automatic lock (Tr. at 27). Officer Brewer could not hear the car doors unlock since he was located at his patrol car a distance away (Tr. at 27). Similarly, he could not see Defendant manipulating the keypad since Defendant's hands were behind his back (Tr. at 27). Officer Carpenter, who was standing at the Camaro, could hear the doors unlock and saw Defendant press the keypad (Tr. at 27, 39-40, 56).

12. Defendant began to yell at Officer Carpenter while she stood at the Camaro (Court's Exh. 1, p. 4). Defendant yelled, "Hey[,] what are you doing? Get out of there. You don't have permission to search. That's not my car. What are you doing? . . . I know the protocol[;] that's my wife's car. That's my fiance's car. . . . You gotta get permission to search that car[;] I know my rights man. . . . [Y]ou gotta ask her to search the car." (Court's Exh. 1, p. 4). Officer Brewer told Defendant he could arrest him for driving without a license and search the car before towing it (Court's Exh. 1, p. 5). Defendant responded, "That's not how it works. . . . Okay[,] this is what I'm saying, I can't give you permission to search something that's not mine. [She's on her way here.]³" (Court's Exh. 1, p. 5).

---

³Defendant's arrest transcription, as contained in Court's Exhibit 1, reads, "Okay this is what I'm saying. I can't give you permission to search something that's not mine, it don't (inaudible)." Based on my own review of the recorded interaction (Government's Exhibit 1), I determined that the portion of the recording deemed "inaudible" is

7

13. During this time, Officer Carpenter looked into the windows, but did not enter the car (Tr. at 16, 40). She was unable to enter the car, as its windows were rolled up, doors locked, and Defendant had the keys (Tr. at 16, 28-29, 39).

14. Officer Brewer radioed in a warrant check to the dispatcher and learned that Defendant had eight outstanding Kansas City warrants and no operator's status (Tr. at 10, 39; Court's Exh. 1, p. 6; Gvt. Exh. 2, p. 4). Defendant was placed under arrest for the outstanding warrants and a search was subsequently conducted of the Camaro (Tr. at 10, 11, 39; Gvt. Exh. 2, p. 4; Court's Exh. 1, p. 6). Approximately six minutes elapsed between the time Officers Carpenter and Brewer initially made contact with Defendant and the time Defendant was arrested.

15. Officers Brewer and Carpenter entered the car using Defendant's keys; they did not break the window (Tr. at 16, 40-41). At no time prior to Defendant's arrest did Officer Brewer, Officer Carpenter, or Sergeant Taylor ever enter, or try to enter, the Camaro (Tr. at 17, 39, 40).

16. Fifteen live rounds of 7.62 millimeter ammunition, five live rounds of .32 caliber ammunition, one .32 caliber spent casing, a SKS magazine, a SKS rifle, and a black revolver were recovered from the Camaro before it was towed from the scene (Tr. at 11, 41, 47-48; Gvt. Exh. 3; Gvt. Exh. 4). The rifle was found in the rear compartment and the revolver was located in the passenger compartment; both guns

---

Defendant saying, "She's on her way here." Although not necessary to my analysis, I note there are several places in the transcript where I was able to understand "inaudible" words/phrases or where I heard words/phrases differently than the transcriber.

were loaded (Tr. at 56; Gvt. Exh. 2, p. 4). Officer Carpenter completed two inventory reports listing the recovered items (Tr. at 46-47; Gvt. Exh. 3; Gvt. Exh. 4).

17. Officer Brewer prepared a report detailing the events that occurred on September 4, 2005 (Tr. at 17; Gvt. Exh. 2). The Investigation Report identified Defendant both as "Victim" and "Suspect 1"; an individual named "Johnny Johnson" was identified as "Suspect 2" (Gvt. Exh. 2, p. 2). Defendant was described as wearing a white shirt and blue shorts (Gvt. Exh. 2, p. 2). Mr. Johnson was described as wearing a blue shirt and blue shorts (Gvt. Exh. 2, p. 2). The report listed the blue Chevy Camaro as a "suspect vehicle" (Gvt. Exh. 2, p. 2).

18. In the text of the Field Incident Report, Officer Brewer wrote, "On 9-4-05 at approx. 1350 hours, [Rochelle Owens] observed a disturbance in front of 4009 Virginia[;] there appeared to be two black males fighting. She observed a black male 5' 05" with [a] blue shirt and blue shorts to have a black handgun. [H]e pointed it at the listed victim and fired it one time." (Gvt. Exh. 2, p. 1 and 3; Tr. at 18, 23). At the suppression hearing, Officer Brewer testified that this statement inaccurately recorded what he was told by Ms. Owens (Tr. at 18, 23). He explained that in writing his report, he reversed what Ms. Owens had told him; the man who fired the gun, rather than the man at whom the gun had been fired, drove the Camaro (Tr. at 19). Likewise, the man wearing blue shorts and a blue shirt was the victim instead of the shooter (Tr. at 19).

19. Officer Brewer referred to Defendant as "victim/suspect" on pages three and four of the report (Tr. at 20). He classified Defendant as a victim because Defendant told

9

him he was the individual at whom the gun had been fired (Tr. at 20). Defendant was also a suspect, as he was ultimately arrested for outstanding warrants (Tr. at 20). However, Officer Brewer referred to Defendant solely as "victim" on page two (Tr. at 22). On page three, Officer Brewer stated, "The victim was running away from Suspect #2 when the shot was fired. The victim then entered a blue Chevy Camero [sic] 2 door and fled the area. Suspect #2 was last observed leaving the area in a unknown white vehicle." (Gvt. Exh. 2; Tr. at 23-24).

20. In describing the encounter when Defendant ignored Officer Carpenter's request to speak with him when he initially pulled into the driveway of 4009 Virginia, Officer Brewer's report stated, "Due to the victim not cooperating with PO Carpenter's request, I placed him into handcuffs . . . [and] walked him to my patrol vehicle." (Gvt. Exh. 2, p. 4; Tr. at 25, 53). Again on page five, Officer Brewer stated, "It should be noted that the suspect/victim did not cooperate in regard to giving a statement about him getting shot at." (Gvt. Exh. 2, p. 5; Tr. at 25, 53-54).

21. Officer Carpenter reviewed Officer Brewer's report after it was completed (Tr. at 53). Additionally, Sergeant Taylor reviewed and approved the report (Tr. at 53).

22. Officer Carpenter testified that she takes precautionary measures when making an arrest for a violent crime (Tr. at 50). For instance, she calls for backup if it is needed (Tr. at 50-51). The Kansas City, Missouri Police Department has procedures in place regarding how to take an individual into custody if that person is believed to be a danger to the officer or to others (Tr. at 51). Generally speaking, officers proceed

with caution, but the specific action taken is based on a judgment call depending on the situation (Tr. at 51, 57-58).

### III.  LEGAL ANALYSIS

Defendant argues that the guns and ammunition seized from the Camaro should be suppressed, since officers searched the car incident to an illegal arrest.  He specifically contends that the arrest was "illegal," in that he was only arrested "because he did not want to cooperate with the officers['] investigation." The government denies Defendant's contention and states Defendant was, instead, arrested for outstanding warrants, thereby making the subsequent search of the Camaro legal. Defendant does not seek to suppress any of the statements he made to Officer Brewer at the scene (Tr. at 42-44, 58-59).

Encounters between law enforcement officers and citizens fall within three general categories: (1) "communications . . . involving no coercion or restraint of liberty [that are] therefore outside the compass of the Fourth Amendment"; (2) "brief, minimally intrusive 'seizures' that must be supported by a reasonable suspicion of criminal activity"; and (3) "highly intrusive, full-scale arrests, which must be based upon probable cause."  United States v. Wallraff, 705 F.2d 980, 988 (8th Cir. 1983).  With regard to the second category, an investigative stop, a "seizure" occurs when a law enforcement officer "accosts an individual and restrains his freedom to walk away." Terry v. Ohio, 392 U.S. 1, 16 (1968).  In order to effectuate such a seizure without violating the Fourth Amendment, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Andrews v. Fuoss, 417 F.3d 813, 817 (8th Cir. 2005)(quoting Terry, 392 U.S. at 21); see also United States v. Rose, 731 F.2d 1337, 1342 (8th Cir. 1984).  The law enforcement officer's suspicion must be based on "more

11

than an 'inchoate and unparticularized suspicion or "hunch."'" Wallraff, 705 F.2d at 988 (quoting Terry, 392 U.S. at 27).

In this case, Officers Brewer and Carpenter's seizure of Defendant was reasonable. The officers were dispatched to 4009 Virginia to investigate a party armed with a gun. Once they arrived at the scene, Ms. Owens told them that a heavy black male, wearing blue shorts and a white shirt, fired a gun at another man in front of 4009 Virginia and then drove away in a blue Camaro. While the officers were speaking to Mr. Ford, a blue Camaro matching the description given by Ms. Owens drove into the neighborhood and ultimately parked in the driveway at 4009 Virginia. Defendant got out of the car and was wearing blue shorts; although he was not wearing a shirt, he was carrying a white shirt with him. These facts give rise to a reasonable suspicion that Defendant may have been involved in criminal activity; therefore, I recommend that the court find the seizure does not violate the Fourth Amendment.

Moreover, Officers Brewer and Carpenter's investigative stop/seizure of Defendant was just that; it did not amount to a *de facto* arrest. "An action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." Rose, 731 F.2d at 1342; see also United States v. Summe, No. 05-4179, 2006 WL 1458293, at *2 (8th Cir. May 30, 2006)("During an investigative stop, officers should 'employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' or the temporary seizure."); United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992)("An investigative stop may become an arrest if it lasts for an unreasonably long time or the officers use unreasonable force in executing it."). Factors considered in distinguishing between a *de facto* arrest and an investigative stop include the length of time the encounter takes, the "degree of fear and

12

humiliation that the police conduct engenders," whether the suspect is transported to another location or isolated from others, and whether the suspect was handcuffed or confined in a police car. United States v. Bloomfield, 40 F.3d 910, 916-17 (8th Cir. 1994)(citations omitted).

Here, Defendant's detention was not overly intrusive. When Officer Brewer encountered Defendant, Defendant matched the description of a party reported to have fired a gun at another individual. I find that it was reasonable for Officer Brewer to remove Defendant from the porch of 4009 Virginia and into the street. There were a large number of people gathered on the porch, including women and small children, and Officer Brewer could also hear voices inside the house. Officer Brewer did not know whether Defendant was armed and was concerned for he and his partner's safety. Defendant was handcuffed during this period of time. Even though use of handcuffs is a factor to weighed in determining whether an investigative stop is more intrusive than necessary, this factor alone is not determinative. In fact, police officers can use handcuffs as "a reasonable precaution during an investigatory stop." Summe, 2006 WL 1458293, at *2 (citing Miller, 974 F.2d at 957). The circumstances surrounding this stop, coupled with the fact that Defendant was being uncooperative and attempted to elude both officers, makes use of the handcuffs a "reasonable precaution." Finally, only approximately six minutes elapsed between the time Officers Brewer and Carpenter first made contact with Defendant and the time he was arrested. Review of the videotaped encounter reveals that there was no undue delay on the part of the officers and Defendant was arrested as soon as the dispatcher informed Officer Brewer that he had eight outstanding warrants and an invalid driver's license. As a result, the court should find Officer Brewer's actions preceding Defendant's arrest fall within the permissible ambit of a Terry stop.

13

According to the above analysis, Defendant was not arrested until Officer Brewer learned of his outstanding warrants and invalid driver's license. Arrests must be supported by probable cause. Wallraff, 705 F.2d at 988. Probable cause exists when an officer knows that an individual has outstanding warrants. See United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). Similarly, Missouri law provides that an officer has probable cause to arrest an individual if he or she does not have a valid driver's license. United States v. Stephens, 350 F.3d 778, 781 (8th Cir. 2003)(citing Mo. Rev. Stat. § 302.020; State v. Kelley, 678 S.W.2d 852, 854 (Mo. App. 1984)). Defendant's arrest was, therefore, lawful.

When a law enforcement officer "makes a lawful custodial arrest of an automobile's occupant, the Fourth Amendment allows the officer to search the vehicle passenger compartment as a contemporaneous incident of arrest." United States v. Poggemiller, 375 F.3d 686, 687 (8th Cir. 2004) (citing New York v. Belton, 453 U.S. 454, 460 (1981)). The Eighth Circuit has interpreted the "passenger compartment" to include the area within an occupant's reach. Id. at 688 (citing United States v. Caldwell, 97 F.3d 1063, 1067 (8th Cir. 1996)("concluding 'police could lawfully search the passenger compartment of the [Camaro], including the hatchback portion of the [Camaro]'"); United States v. Thompson, 906 F.2d 1292, 1298 (8th Cir. 1990)). This principle applies "even when an officer does not make contact until the person arrested has left the vehicle." Id. at 687 (citing Thornton v. United States, 541 U.S. 615, 617 (2004); United States v. Snook, 88 F.3d 605, 608 (8th Cir. 1996)).

Here, Officers Brewer and Carpenter observed Defendant drive the Camaro into the driveway of 4009 Virginia and saw him get out of the vehicle. Only after Defendant was arrested did they conduct of search of the Camaro. Officer Carpenter testified that one gun was found in the passenger

14

compartment, whereas the other was located in the rear compartment. Because Defendant was a recent occupant of the Camaro and had been arrested for outstanding warrants, the items recovered from the passenger compartment were seized as part of a search incident to lawful arrest and should not be suppressed. Likewise, although the record is unclear concerning the location of the items recovered from the Camaro's rear compartment, such items are also likely admissible under Caldwell. Even if the officers should not have searched the rear compartment incident to arrest, they certainly could have seized the items pursuant to an inventory search as Defendant could not legally operate the car without a valid driver's license and the Camaro was towed following his arrest. See United States v. Stephens, 350 F.3d 778, 780 (8th Cir. 2003). The guns and ammunition should thus be found admissible.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 13, 2006